**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| | : | |
| DARNELL BELL, | : | |
| | : | Civil Action No. 13-2905 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| PAULA DOW, et al. | : | |
| | : | |
| Respondents. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Darnell Bell ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). Following an extension, the State has filed a response to the petition (ECF Nos. 12-15). Petitioner did not file a reply brief. For the following reasons, this Court will dismiss the petition as time barred and will deny Petitioner a certificate of appealability.

## I.  BACKGROUND

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division provided the following summary of the basic facts underlying this case:

> [Petitioner]'s convictions arose out of his participation in the robbery and murder of Stephanie Hosley on March 16, 1997, in Elizabeth.  Hosley was robbed and murdered after she was transported to an ATM . . . by a taxi-cab driven by [Petitioner's] co-defendant Gabriel Dindayal.
>
> [Petitioner], Dindayal and A.H., a juvenile, were in the taxi-cab with Hosley after she had made a withdrawal from the ATM[.] The gun used to commit the crimes was [Petitioner's], which he used

to shoot Hosley at least once.   After Hosley was murdered, her body was pushed from the taxi-cab.   Subsequently, Dindayal went to a friend's home and obtained "two socks" and "a little bowl of water["] to clean up the victim's blood in the taxi-cab.   Thereafter, Dindayal drove back to the area where Hosley's body was thrown and drove over her body with the taxi-cab.

Following an investigation, Dindayal was arrested and warrants were issued for [the arrest of] A.H. and [Petitioner].   On March 20, 1997, detective Albert Mendes and other officers went to a residence at 933 Olive Street where [Petitioner] was known to stay at times [after failing to locate Petitioner at his last known address].   The officers knocked on the door and announced they were looking for [Petitioner].   After being let into the house by a woman, one of the officers heard a noise coming from the attic.   Detective Mendes knew how to reach the attic, because he had been to the home on previous occasions.   He and detective Kevin Foley entered the attic where they found [Petitioner] hiding.   [Petitioner] was placed under arrest and handcuffed.   At police headquarters, [Petitioner] confessed to his role in the crime, giving both an oral and written statement.

[Petitioner] admitted to agreeing to rob Hosley and shoot her with his gun.   In addition, he told police that he was intoxicated because he had drunk "a lot" of alcohol and smoked marijuana.

The [trial] judge held a hearing on the admissibility of [Petitioner]'s confession and held that it was admissible at trial. [Petitioner]'s confession was presented at trial and [Petitioner] was convicted[.]

(Document 5 attached to ECF No. 13 at 3-4).

Prior to Petitioner's trial, the trial court held a hearing pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), to determine whether Petitioner's statement to the police would be admissible at trial.   During the hearing, Detective Mendes testified as to his investigation of the Hosley killing which ultimately led to Petitioner's statements to the police.   (Document 5 attached to ECF No. 14 at 40-44).   Specifically, Mendes testified that the investigation ultimately led police to Dindayal, who gave them a statement in which he indicated that

2

Petitioner shot and killed Hosley during the robbery in the taxi-cab.   (*Id.*).   Mendes then used

that statement to acquire an arrest warrant for Petitioner, leading to Petitioner's arrest as

recounted above.   (*Id.* at 45-50).   Mendes testified that Petitioner, when he was seized in the

attic, was told that he was under arrest and advised not to speak with officers until he was taken

to police headquarters.   (*Id.* at 50).   The detective clarified on cross-examination that, following

his arrest, Petitioner arrived at headquarters at about 6:30 a.m. and was placed in a cell block for

approximately two hours before being taken to a separate room to speak with the detectives.

(Document 6 attached to ECF No. 14 at 13-14).   The detective also stated that, during his time

in the holding cell, Petitioner had open access to a bathroom and water fountain.   (*Id.* at 25-26).

Mendes testified that he and another detective interviewed Petitioner at 9 a.m. that

morning.   (Document 5 attached to ECF No. 14 at 51).   The detective stated that Petitioner was

read each of his *Miranda* rights, that he acknowledged that he understood those rights, and

waived them.   (*Id.* at 51-53).   Petitioner also read a *Miranda* rights form out loud, advising the

officers that he understood those rights and wished to waive them.   (*Id.*).   Mendes testified that

Petitioner had been told when he was arrested that he was under arrest for murder, and that

Petitioner thus began the questioning by attempting to ask the officers questions to determine

how much the officers knew about the death of Ms. Hosley.   (*Id.*at 54).

Although Petitioner initially denied knowing about the murder, once the detectives told

him that Dindayal had already given a statement implicating Petitioner, Petitioner became angry

and said "[t]hat little fag dimed me out."   (*Id.* 56-57).   Petitioner then gave a statement to police

in which he claimed that Dindayal and A.H. had approached him asking him to help them rob

Hosley, that Petitioner "didn't care" whether or not he helped them, that Petitioner got into the

cab, got his gun from his home, and that the three men robbed Hosley, with both Dindayal and

Petitioner shooting her.   (*Id.*at 57-60).   Petitioner also told the police about the efforts the three

engaged in to rid themselves of her body.   (*Id.* at 60-63).   After giving this oral statement,

Petitioner also provided the police with a written statement to the same effect, which he read,

confirmed, and signed.   (*Id.* at 64).

As to Petitioner's demeanor, the detective testified that Petitioner was alert and

cooperative, and had never asked to stop the interview, for a lawyer, or the like.   (*Id.* at 65-67).

The detective further stated that he believed that Petitioner was offered food and drink, although

he couldn't recall at what point in the interview that occurred.   (*Id*. at 67).   On cross

examination, the detective denied that Petitioner had been told that he was being questioned

regarding an unrelated shooting.   (Document 6 attached to ECF No. 14 at 13-20).

Petitioner also testified at the *Miranda* hearing.   During his testimony, Petitioner claimed

that he had run from police because he had cocaine and marijuana on his person when they

arrived, which he flushed down a toilet.   (*Id.* at 35).   Petitioner also stated that he was on the

toilet, rather than in the attic, when the police entered the bathroom and took him into custody.

(*Id.* at 36).   Petitioner testified at the hearing that he was then placed into a police vehicle

without being told why he was being taken to police headquarters.   (*Id.*at 36-38).   He further

asserted that, upon arrival at headquarters, he was immediately taken to an interrogation room for

approximately three hours before police arrived to question him.   (*Id.* at 39-40).   Petitioner also

testified that he was refused the use of a bathroom when he asked, that he was given only a cup

of water to drink, and was not offered or given food.   (*Id.* at 40-41).

Petitioner then testified that when the questioning did start, police were asking about a different shooting which had occurred the prior New Year's, in which Petitioner's friend had been shot, which they continued to do for an hour.   (*Id.* at 41).   Petitioner also claimed that he waived his *Miranda* rights fully believing that this prior shooting was the subject of his interview.   (*Id.* at 42).   Following his waiver, Petitioner testified that he was told by the officers that he had been implicated in the murder of Hosley.   (*Id.* at 43).   Petitioner testified that he was confronted with Dindayal's statement, that police told him they didn't believe that statement, and that the detectives told him that if he helped by making a statement he "wouldn't be charged with nothing."   (*Id.* at 43-47).   Petitioner claimed that he was then given a written statement he had not made, told to sign and initial each page, and was not permitted to read what he had signed. (*Id.* at 50-52).

On cross-examination, Petitioner admitted that he had initially lied to police.   (*Id.* at 54). Petitioner also admitted that he had told police that he had shot Hosley after Dindayal had first done so.   (*Id.*).   Petitioner also admitted that this information matched that in the written statement.   (*Id.* at 54-55).   Petitioner, however, then denied ever having admitted telling the police that he had shot Hosley, and instead claimed that he had only meant to confirm that this information was in the written statement he had signed.   (*Id.* at 56).   Petitioner also denied actually reading the *Miranda* waiver form or having it read to him, claiming that he had written on the form that he had read and understood each right without actually having done so.   (*Id.* at 60-61).

At the conclusion of the hearing, the trial judge denied Petitioner's motion to suppress, finding Petitioner's version of events incredible and finding the detective's testimony credible.

(Document 7 attached to ECF No. 14 at 84-90).   In so doing, the trial judge made the following

findings which were upheld by the Appellate Division on direct appeal:

> I find that [Petitioner] was arrested, brought to police headquarters and questioned by the police . . . approximately at 6:30 a.m. or thereabouts   I find that it is not credible that he was taken up to a detective interrogation room and kept there uncuffed for two and a half hours . . . . I find that incredible that the police would not check on him, with the computer and everything else [in the room].  So, I find the Officer – Detective Mendes'[s] testimony more credible as far as [Petitioner] is brought into headquarters[ and] placed in the holding cell.  I find, obviously, in that holding cell he had use of bathroom facilities, and had access to water in the event he was thirsty.
>
> . . . .
>
> As to the issue of voluntariness[,] a record must show some credible evidence that the police did something wrongfully, meaning that they engaged in some wrongful act or unlawful act of specific conduct that broke [Petitioner]'s will.  If this is demonstrated by the record the confession must be suppressed. Here, the only allegation I have is that [Petitioner] was not given the right to use the bathroom over the period of time, meaning from 6:30 a.m. on to the end of the confession, that he was not offered food or drink.  This is in contravention of what Detective Mendes testified to . . . . The issue is whether or not his will was broken because he was not given food or water.  [Petitioner] never testified that that deprivation in any way affected his ability to act freely and voluntarily.  Detective Mendes testified that food and beverage[s were] offered to him and that is the – to the best of his recollection, and the detective indicated more than likely that the detectives, themselves, had something in the presence of [Petitioner] and that he refused, but there is nothing over this short of [a] period of time, when you look at the totality of the circumstances, to show any unlawful or illegal conduct on the part of the [detectives] that was engaged in [for] the purpose of breaking [Petitioner]'s will . . . .
>
> As to the question of [Petitioner] knowing what he is talking about, what his waiver applied to, I've cited the cases that say he doesn't have to have knowledge specifically, but in this case I don't think there is any question he knew what he was brought into headquarters for.  They had an arrest [warrant] based on Dindayal's

6

statement for [Petitioner] as [a] murderer.  The police have him cuffed, he is brought in, they have the house surrounded, it would just be inconceivable in my mind that this [Petitioner] believes he is brought in for purposes of some type of an interrogation involving something where he may have knowledge of or be a witness to when he is arrested in that fashion.  I accept and find based on the testimony of Detective Mendes that this [Petitioner] was advised that he was at headquarters for the purpose of giving a statement as it related to the murder of Miss Hosley and not for something that may have occurred a year or two before concerning a friend of [Petitioner] who was a victim of a shooting.

. . . .

Here [Petitioner] was a knowing and willing participant in the oral and written statement.  He never invoked his rights as far as *Miranda* was concerned, never told the police he wanted to stop the statement; either oral or written.  I find that [Petitioner] when he was confronted with Dindayal's statement, whether he actually read it or not is not crucial in my mind, bottom line he was told what Dindayal said concerning his involvement in the murder and indicated he wanted to get the record straight to show that it was Dindayal who was the primary actor and not himself, and I think that comes across clearly based on the oral communications provided to him when he admitted he lied to the police.  He was trying to minimize his own involvement.  So, there was nothing done by the police to coerce a confession out of him or nothing done to break his will, [Petitioner's statement] was knowingly and voluntarily [given] on his part.

(Document 5 attached to ECF No. 13 at 5-7).

Petitioner's statements were thereafter admitted against him at trial.  Following the trial, the jury convicted Petitioner of murder in violation of N.J. Stat. Ann. § 2C:11-3(a)(1) and (2); felony murder in violation of N.J. Stat. Ann. § 2C:11-3(a)(3) based on the robbery of Hosley; robbery in violation of N.J. Stat. Ann. § 2C: 15-1; possession of a handgun for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-4(a); and unlawful possession of a handgun in violation of N.J. Stat. Ann. § 2C:49-5(b).  (*Id.* at 1).  "At sentencing, the [trial] judge merged

the felony murder, robbery and weapons convictions with the murder conviction and sentenced

[Petitioner] to a sixty-year custodial term with a thirty-year parole disqualifier."   (*Id.* at 1-2).

Petitioner appealed, and the Appellate Division affirmed on October 10, 2002.   (*Id.*).   The New

Jersey Supreme Court thereafter denied Petitioner's petition for certification on January 30,

2003.   (Document 8 attached to ECF No. 13).

On April 4, 2003, Petitioner filed his initial pro se petition for post-conviction relief.

(*See* Document 14 attached to ECF No. 14 at 14).   Petitioner thereafter filed an amended

petition on May 24, 2004.   (*Id.*).   Following a hearing on February 22, 2005, the trial court

denied Petitioner's first petition for post-conviction relief.   (*Id.*).   Petitioner appealed, and the

Appellate Division affirmed the denial of relief by way of a published opinion dated November

17, 2006.   (Document 11 attached to ECF No. 13).   The New Jersey Supreme Court denied

Petitioner's petition for certification on February 13, 2007.   (Document 13 attached to ECF No.

13).

Petitioner thereafter filed a second petition for post-conviction relief on August 30, 2007.

(Document 1 attached to ECF No. 1 at 5).   The trial court denied that second petition on

September 2, 2008.   (Document 14 attached to ECF No. 14 at 33).   Petitioner appealed and the

Appellate Division affirmed on November 21, 2011.   (Document 16 attached to ECF No. 13).

The New Jersey Supreme Court in turn denied Petitioner's petition for certification on May 3,

2012.   (Document 3 attached to ECF No. 14).   Petitioner thereafter filed his current petition for

a writ of habeas corpus on May 2, 2013.   (ECF No. 1 at 14).

This petition, however, is not Petitioner's first attempt at challenging his conviction in the

federal courts.   On April 3, 2012, before the denial of Petitioner's second PCR petition had

8

become final, Petitioner filed in this Court a petition for a writ of habeas corpus.   (Docket No.

12-2046 at ECF No. 1).   On April 17, 2012, Judge Cavanaugh entered an order in that case

advising Petitioner of his rights pursuant to *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000)

(requiring courts to ensure that § 2254 petitioners are aware of the fact that they must bring all of

their federal claims in a single, all-inclusive petition for a writ of habeas corpus).   (Docket No.

12-2046 at ECF No. 2).   In response to that Order, Petitioner submitted a letter to the Court

stating that he wished to withdraw his first habeas petition so that he could later file another

petition containing all of his claims, including those from his second PCR petition.   (Docket No.

12-2046 at ECF No. 5).   As a result, Judge Cavanaugh entered an order on July 19, 2012,

dismissing Petitioner's first petition for a writ of habeas corpus without prejudice as withdrawn.

(Docket No. 12-2046 at ECF No. 6).


## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of

habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United

States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim

presented in his petition based upon the record that was before the state court.   *See Eley v.*

*Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S.

Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death

Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to

the determinations of the state trial and appellate courts.  *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  *Id.*   Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).


## B.   Analysis

### 1.   Petitioner's petition for a writ of habeas corpus is clearly time barred

The State argues that Petitioner's petition should be dismissed as time barred.   Petitions brought pursuant to § 2254 are subject to a one year statute of limitations.  *Ross v. Varano*, 712

10

F.3d 784, 798 (3d Cir. 2013).   The statute normally runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" including the ninety day period for the filing of a petition for certiorari before the Supreme Court.   *Id.*   This statute of limitations, however, is statutorily tolled while a petitioner has a properly filed petition for post-conviction relief pending before the state courts.   *See, e.g., Figueroa v. Buechele*, No. 15-1200, 2015 WL 1403829, at *2 (D.N.J. Mar. 25, 2015).

Here, Petitioner's conviction became final on April 28, 2003, ninety days after the denial of certification on his direct appeal when the time for the filing of a petition for certiorari had run. Petitioner, however, filed his pro-se PCR petition prior to that date on April 4, 2003.   Petitioner's first PCR petition ceased to be "pending" when certification on that petition was denied on February 13, 2007.   Thus, as of February 2007, none of the one year period had run.

By Petitioner's own admission,[1] he did not file his second petition for post-conviction relief until August 30, 2007.   (Document 1 attached to ECF No. 1 at 5).   Thus, 198 days of the one year statute of limitations had run before Petitioner's filing of his second petition for post-conviction relief tolled the running of the remainder of the one year.   That petition remained pending until May 3, 2012, when the New Jersey Supreme Court denied certification.   Thus, 364 more days had run by the time Petitioner filed his petition on May 2, 2013.   In total, by the time Petitioner had filed his current petition for a writ of habeas corpus, 562 days had elapsed which were not subject to equitable tolling prior to the filing of the petition, and Petitioner therefore exceeded the one year statute of limitations by 197 days.

---

[1] Petitioner specifically states in his brief that his "second petition for post-conviction relief follow[ed].   On August 30, 2007."   (Document 1 attached to ECF No. 1 at 5).

Petitioner's petition is clearly time barred absent some form of equitable tolling. Equitable tolling "is a remedy which should be invoked 'only sparingly.'" *United States v. Bass*, 268 F. App'x 196, 199 (3d Cir. 2008) (quoting *United States v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998)). To be entitled to equitable tolling, a petitioner must show "(1) that he faced 'extraordinary circumstances that stood in the way of timely filing,' and (2) that he exercised reasonable diligence" in pursuing his rights throughout the period to be tolled. *United States v. Johnson*, 590 F. App'x 176, 179 (3d Cir. 2014) (quoting *Pabon v. Mahanoy*, 654 F.3d 385, 399 (3d Cir. 2011)). "There are no bright lines in determining whether equitable tolling is warranted in a given case." *Pabon*, 654 F.3d at 399. Tolling, however, should only be permitted "in the rare situation where it is demanded by sound legal principles as well as the interest of justice." *LaCava v. Kyler*, 398 F.3d 271, 275 (3d Cir. 2005).

To show that he faced extraordinary circumstances, the petitioner must show either that he has been actively misled, that he was prevented from asserting his rights in some extraordinary way, that petitioner timely asserted his rights in the wrong forum, or that a court somehow misled the petitioner regarding the steps he needed to take to preserve his claim. *See Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999); *see also Brinson v. Vaughn*, 398 F.3d 225, 230 (3d Cir.), *cert. denied*, 546 U.S. 957 (2005). A miscalculation of the time remaining on a given limitations period generally does not constitute extraordinary circumstances. *See Johnson v. Hendricks*, 314 F.3d 159, 163 (3d Cir. 2002). Ignorance of the law is also generally insufficient to excuse a late filing, even where the petitioner is incarcerated and acting pro se. *See United States v. Johnson*, 544 U.S. 295, 311 (2005); *see also Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir. 1999), *cert. denied*, 531 U.S. 1164 (2001).

12

In his petition, Petitioner presents only one argument in support of his contention that his petition should be treated as timely.   Petitioner argues that his first petition was dismissed "until next month[, June 2013,]" because Petitioner had been required to file his first habeas petition before receiving the denial of certification on his second PCR petition.   (ECF No. 1 at 12-13, Document 1 attached to ECF No. 1 at 5).   Although Petitioner asserts that his habeas petition was withdrawn until "next month," he presents nothing to support the assertion that Judge Cavanaugh provided him permission to file a new petition by June 2013.

A review of Judge Cavanaugh's Orders indicated that Petitioner was informed in Judge Cavanaugh's *Mason* Order that, if he chose to withdraw his petition, his AEDPA limitations period would be tolled from "the date [he] handed [his original habeas petition over] for mailing [through] 45 days after the date of entry of this Order."   (Docket No. 12-2046 at ECF No. 2). That Order was dated April 12, 2012.   Petitioner was also informed in that Order that in order to timely file his petition, he would need to file it before 365 days of un-tolled time had elapsed. (*Id.*).   Nothing in the order dismissing Petitioner's petition as withdrawn provided Petitioner with greater tolling, or otherwise advised Petitioner that he would be permitted any extra time in filing his new habeas petition.   (Docket No. 12-2046 at ECF No. 6).   Thus, in order to account for any "misleading" that may arguably have occurred based on Judge Cavanaugh's orders, this Court will give Petitioner the benefit of the period of tolling offered by Judge Cavanaugh's April 12, 2012 order, and toll the statute of limitations between May 3, 2012, when the New Jersey Supreme Court denied certification, and May 27, 2012, when the forty-five days provided by Judge Cavanaugh's *Mason* order had elapsed.   This would give Petitioner an extra twenty-four days to file his Petition.   Even granting Petitioner those extra twenty four days, Petitioner's

13

petition would still have exceeded the limitations period by more 173 days, and would thus still be time barred.

Even if this Court were instead to run that forty-five extra days from the date on which Judge Cavanaugh dismissed Petitioner's first habeas petition as withdrawn, Petitioner's limitations period would have begun to run as of September 2, 2012, forty-five days after Judge Cavanaugh's July 19 dismissal order.   From that date, 242 days elapsed before Petitioner filed his current habeas petition.   Combined with the 198 days which passed between the denial of certification on Petitioner's first petition for post-conviction relief and the filing of Petitioner's second petition for post-conviction relief, a total of 440 un-tolled days would have elapsed before Petitioner filed his habeas petition.   As such, even if this Court were to grant Petitioner the benefit of the most generous reasonably mistaken reading of Judge Cavanaugh's orders and toll the statute of limitations between May 3 and September 2, 2012, Petitioner's petition for a writ of habeas corpus would still be well and truly time barred.   Thus, Petitioner's current petition would be time barred even if this Court were to provide Petitioner with the greatest period of tolling he could reasonably expect based on the only argument he has presented as to timeliness.[2]  Because Petitioner's petition would be time barred even if this Court gave him the maximum period of tolling to which he could possibly be entitled by his mistaken understanding of Judge Cavanaugh's orders, because Petitioner has failed to present any other basis for

---

[2] Although this Court need not address the issue considering the fact that Petitioner's petition would be time barred even were he to receive the maximum tolling he could reasonably expect under Judge Cavanaugh's order, Petitioner's entitlement to tolling would still require him to show that he was diligent in pursuing his rights.   *See Pabon*, 654 F.3d at 399.   Given the nearly ten months which passed between the dismissal of his first habeas petition and his filing of his current habeas petition, it is doubtful that Petitioner could show that he has been reasonably diligent, and Petitioner makes no such attempt in any event.

14

equitable tolling, and because this Court perceives no other basis for tolling, this Court will dismiss this petition for a writ of habeas corpus as time barred.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   Because jurists of reason could not disagree with this Court's conclusion that Petitioner's habeas petition is well and truly time barred, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further, and this Court will therefore deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DISMISSED as time barred and Petitioner is DENIED a certificate of appealability.   An

appropriate order follows.


Dated: June 30, 2016                                   ___*s/ Susan D. Wigenton*_____
                                                       Hon. Susan D. Wigenton,
                                                       United States District Judge

16